Filed 3/5/24  P. v. Solorio CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D080839 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. F105120) |
| JOSE A. SOLORIO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Joan P. Weber, Judge.  Affirmed in part; reversed and remanded in part with instructions.

Stephen M. Vasil, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Melissa Mandel, Deputy Attorneys General, for Plaintiff and Respondent.

Jose A. Solorio appeals from a judgment following his convictions on two counts of second degree murder.  He argues the convictions should be reversed because the trial court prejudicially erred in not instructing the jury on the lesser included offense of voluntary manslaughter in the heat of

passion. He also argues his sentence should be modified because the trial court erred in two additional ways: (1) by not including presentence conduct credits in its award of presentence custody credits; and (2) by imposing a parole revocation restitution fine. The Attorney General concedes the sentencing arguments, but contends an instruction on the lesser included offense was not warranted because heat of passion manslaughter was not supported by substantial evidence. We agree with the Attorney General. Hence we affirm the convictions and remand the matter to the trial court to correct the sentence.

## I.
## FACTUAL AND PROCEDURAL BACKGROUND

This case turns on events that occurred one summer evening, more than 36 years ago in 1987. Late that evening, 27-year-old Jose Solorio returned to a home in Ramona where, hours earlier, he had gathered with others to celebrate the birthday of a four-year-old child. Upon arrival, Solorio exited his car, climbed a flight of stairs, and stepped into a room in which partygoers were still gathered. Moments later, he fired three bullets from a handgun. One bullet pierced the heart of the birthday girl's father, German Aviles. Another pierced the heart of her cousin, Ventura Aviles. And the third lodged in the chest of another cousin, Carlos Holguin.

As Solorio fled the residence, he chanced upon the birthday girl's uncle, Jose Aviles. A scuffle ensued, in which two more bullets were fired from Solorio's gun. Each bullet entered Jose's[1] thigh; and one traveled through his intestines, lodging near his spine.

---

[1] Because several of the family members share the same last name, we refer to each of them by first name. We do so for the sake of clarity, intending no disrespect.

German and Ventura died that evening. Jose and Carlos survived. And Solorio fled into the night.

## A. The Testimony at Trial, in General

Years later, in 2019, after having been apprehended in Mexico and extradited to the United States, Solorio was tried on charges of murder in connection with the deaths of German and Ventura.[2] At trial, Solorio asserted self-defense.

The jury heard testimony that, on the day of the shooting, a group of 25 to 30 people had gathered at an apartment in Ramona in which the birthday girl resided with her father and mother, German and Rosario, and with her uncle and aunt, Jose and Angela. Each of these five individuals was present at the party. So too were other family members and invitees—including Solorio, his wife, and their two young daughters.

There was food, soda, beer, cake, and a pinata. Over the course of about six hours, the men drank beer. At one point, the conversation turned to taking up a collection, with each of the men to contribute five dollars, for the purpose of purchasing more beer. Solorio said he would contribute to the collection were it not for the fact that the only bills he had were $100 bills, and he proceeded to display the contents of either his wallet or an envelope to demonstrate that he was telling the truth. Then an argument ensued.

Accounts of the argument vary somewhat. For example, whereas Solorio, Rosario and Angela say Jose rebuked Solorio for flashing his money

---

[2] Shortly after the events of the evening in issue, Solorio was charged with murder in connection with the deaths of German and Ventura, and attempted murder in connection with the injuries sustained by Carlos and Jose; however, the attempted murder charges were dismissed in connection with the extradition proceedings because the Mexican statute of limitations governing those charges had lapsed.

around "like a prostitute" or "a whore," Jose attributes such remarks to German. Likewise, whereas Jose and Angela say Solorio challenged Jose to a fight, Solorio says it was Jose who challenged *him* to fight. In all events, each of the eyewitnesses who testified at trial—Solorio, Rosario, Angela, Jose, Carlos and another of the birthday girl's cousins—agree that the argument rapidly descended into name-calling, shouting, and talk of fist fighting.

But before the talk of fighting could degenerate into an actual fist fight, Solorio left the party accompanied by his wife and daughters. He drove them home and left them there. Then he armed himself with a handgun and drove back to the party.

**B.    The Testimony of Solorio on Direct Examination**

Each eyewitness to the argument and each eyewitness to the shootings who testified at trial described the evening's events in ways that corroborated the descriptions of other witnesses in some respects, and contradicted them in other respects. In resolving discrepancies in the witnesses' testimony, we view the evidence in the light most favorable to the theory asserted by Solorio on appeal, namely that substantial evidence mandated a heat of passion instruction. (See *In re Hampton* (2020) 48 Cal.App.5th 463, 480 (*Hampton*) ["In assessing the sufficiency of the evidence to support [a heat of passion manslaughter] instruction, 'we view the evidence in the light most favorable

4

to the defendant.' "].)  In large measure (but not in all respects[3]) in this case, that light is the one cast by the testimony of Solorio himself.  Hence, we turn now to a discussion of Solorio's testimony on direct examination.

1.    ***Solorio's Testimony Regarding Why He Left the Party***

On direct examination, Solorio testified about hostile remarks that he said Jose had directed at him during the party:

> "Q:  You indicated . . . the argument escalated.  What happened?
>
> "A:  Well, they asked me for money so they could buy more beer because they wanted to continue drinking.
>
> "Q:  And what did you say?
>
> "A:  I said, 'Tomorrow is Sunday.  I have to go to work, and I don't have any change.'
>
> "Q:  How was that received?
>
> "A:  As if I was a tightwad, as if I was a person – Now can I say the words?
>
> "Q:  Yes.
>
> "A:  That I was a chickenshit person and almost like a faggot because I didn't want to continue drinking.
>
> "Q:  And who said that?

---

[3]    Importantly, in viewing the evidence in the light most favorable to the theory for which Solorio is contending on appeal, we do not confine our review to just the testimony of Solorio or to just the testimony that his counsel adduced at trial.  (See *In re Lopez* (2023) 14 Cal.5th 562, 591 ["It is well settled that the jury has wide latitude to believe or disbelieve witnesses, or even specific portions of their testimony, as it sees fit."]; *People v. Wader* (1993) 5 Cal.4th 610, 641 ["jury [is] free to believe some of defendant's statements and to disbelieve other [of his] statements"].)  Instead, we embrace any substantial evidence favoring the theory for which Solorio is contending on appeal, even if such substantial evidence is contradicted by the testimony of Solorio or (as is the case here) by the testimony of numerous other witnesses.

"A:  Mr. Jose Aviles.

"Q:  What did you say in response?

"A:  I said, 'If I'm all those things that you are saying, why did you invite me to the party?'

"Q:  [Then] what happened?

"A:  He said, referring to the other people at the party, 'Who the fuck invited him?'

"A:  I insisted, 'Why did you invite me, then?  Why were we given an invitation which said 'family?'

"Q:  What happened next?

"A:  He said, 'You want to know why?'

"Q:  What did he say?

"A:  He said, 'To fuck you up, to take your money, and get even,' pointing to my wife, 'with her.' "

Solorio further testified that:  he interpreted these remarks as threats directed at his daughters, his wife, and himself; he took the threats seriously; and he knew he was outnumbered.  It was for these reasons, he testified, that he made two decisions:  a decision(1) not to fight then and there; and a decision(2) to gather his family and depart.

"Q:  What did you think about the reality of the threats being acted on?

"A:  I took them very seriously, and I preferred to leave – that we leave.

"Q:  These threats of 'fuck you up, take your money, get even through your wife,' was this before or after there was a discussion about going downstairs to fight?

"A:  That was afterwards.  Because he said, 'If you don't believe me, we're going to go downstairs.'

"Q:  Was there a discussion about just you and Jose Aviles going downstairs to fight?

"A:  The three of them were going to go downstairs . . .

6

"Q: Who do you mean by 'the three of them'?

"A: Ventura and German and, of course, Mr. Jose.

"Q: Why did you decide not to go downstairs to fight?

"A: My girls were asleep and my wife was inside.

"Q: So what did you do then?

"A: I preferred to tell my wife to get the girls up and for us to leave.

"Q: And did you leave the party then?

"A: Yes."

## 2. *Solorio's Testimony Regarding Why He Returned to the Party, and Why He Came Armed*

Asked what he was thinking as he was leaving the party, Solorio testified he was thinking "that I was going to go to work the next day and that my wife and my daughters were going to be left alone." Asked what was going through his mind after he had taken his family back home, Solorio testified that "the idea that was going through my head was that they would make good on the threat."

Out of concern at what he perceived to be the continuing nature of the threat, Solorio testified, he made two more decisions when he arrived home: a decision(1) to return to the apartment to talk things out; and a decision(2) to arm himself for protection.

"Q: What did you decide to do in response to [your concern that they would make good on the threat]?

"A: To go and to try and fix this by talking.

"Q: You said that you wanted to try to fix this by talking. We know you had a firearm that night.

"A: Yes.

"Q: Can you explain why you brought the firearm if you wanted to fix things by talking?

7

"A: Because previously, since it was four of them, they wanted to beat me up. And, of course, I felt that I was at a disadvantage."[4]

### 3. Solorio's Testimony Regarding What Happened When He Returned to the Party

Asked a series of questions about what happened when he arrived back at the apartment, Solorio testified as follows:

"Q: What did you do when you arrived back at the apartment?

"A: I went inside about two or three paces. I had the gun on the right side of my waist so they could see it.

"Q: Was your plan when you first got to the apartment to shoot people?

"A: No, of course not.

"Q: So what did you try to do when you first arrived?

"A: Well, to try and talk to them and for them to calm down and for them to retract that threat.

"Q: And so what happened when you arrived?

"A: Their reaction was as if they had already been waiting for me.

"Q: What do you mean by that?

"A: They got up at that very moment and took steps toward me.

"Q: Did you try and say anything . . . at that point about them approaching you?

"A: I said, 'Don't get near me.' I said, 'Don't get near me.' Two times.

"Q: Were you afraid at that point?

---

[4] The "four of them" to whom Solorio was referring were German, Jose, Ventura, and Carlos. Solorio testified that he knew these four men "fought as a group."

"A: Of course."

Then, Solorio testified the men in the room advanced toward him, and, "believ[ing] . . . they were going to hurt" him, he opened fire in self-defense, intending to stop but not kill them.

### 4. *Solorio's Testimony Regarding What He Was Thinking as He Was Pulling the Trigger*

In response to several questions addressed to the topic of what "was . . . going through [his] mind at th[e] time" of the shootings inside the apartment, Solorio testified: "My mind was going 1,000 miles an hour, and I remember everything," including the fact that, even as the men were advancing upon him, he "was focused on speaking to them" yet also thinking that "they fought as a group" and "could have . . . weapons" and the possibility that "what happened to my father" (a policeman who had been killed when Solorio was eight years old) "is going to happen to me."

## C. The Testimony of Solorio on Cross-Examination

### 1. *Solorio's Testimony Regarding Threats and Insults that Had Been Directed at Him; Who Had Uttered Them; and How They Made Him Feel*

On cross-examination, Solorio responded to a series of questions probing the topics of who specifically had directed threats and insults at him and his family and how such threats and insults had affected him. In response to these questions, he testified that the threats and insults had been leveled by Jose, and that they had made him angry:

> "Q: This morning you told us that Jose Aviles told you at the party that night that you were invited because he wanted to 'fuck you up and take your money and get even through your wife'?
>
> "Q: It was Jose that said this; correct?
>
> "A: Yes.
>
> "Q: It was not Carlos, was it?

9

"A:  It was Jose.

"Q:  It was not Ventura, was it?

"A:  It was Jose.

"Q:  It was not German, was it?

"A:  It was Jose.

"Q:  And Jose was the one that said to you that you were chickenshit; correct?

"A:  That I was chickenshit, a cheapskate, even a faggot.

"A:  And a prostitute.

"Q:  Well, let's clarify.  Did he call you chickenshit, a cheapskate, and a prostitute or a faggot?

"A:  Yes.

"Q:  Which one?

"A:  Jose.

"Q:  Which word?

"A:  A slut.

"Q:  Okay.  Did you understand him to mean that you were gay?

"A:  And a faggot.

"Q:  I'm asking you is that what you – did he call you that, or did you understand that?

"A:  Yes.  I understood that, yes.

"Q:  Did that make you angry?

"A: Yes."[5]

## 2. *Solorio's Testimony Regarding the Homosexuality-Related Insults in Particular*

After eliciting Solorio's testimony regarding the specific insults that had been directed at him, the prosecutor initiated a line of questioning that focused on Solorio having lived with a man who was openly gay:

"Q: You had lived with a man named Ramon, hadn't you?

"A: Yes.

"Q: Did people criticize you for living with Ramon?

"A: No.

"Q: Did people criticize you because you were living with a man in 1987 that was openly gay?

"A: There were rumors.

"Q: About Ramon?

"A: No, about me."

---

[5] The accounts that other witnesses supplied regarding the substance of the argument and Solorio's emotional state at the time of the argument varied. With regard to Solorio's emotional state at the time of the argument, two witnesses (Jose and Carlos) said Solorio became "angry" or "upset" during the argument, a third witness (young cousin) said Solorio "wasn't mad" and "didn't look upset," a fourth witness (Rosario) said she "did not notice . . . [Solorio] was upset," and a fifth witness (Angela) told a detective on the night of the shootings that Solorio "was enraged and felt he had been embarrassed in front of his family" but then testified at trial that *nobody* got angry during the argument. Because " 'we view the evidence in the light most favorable to the defendant' " for purposes of the argument Solorio is making on appeal (see *Hampton, supra,* 48 Cal.App.5th at p. 480) and because we conclude the evidence supporting an inference that Solorio became angry, upset, or enraged is substantial, we embrace that evidence and disregard the evidence supporting an inference to the contrary.

The prosecutor then concluded this line of inquiry with a series of questions inquiring into the impact that the homosexuality-related insults in particular had had on Solorio:

> "Q: Did that make you more sensitive when he called you gay in 1987, that there had been these rumors before?
>
> "A: Yes.
>
> "Q: Did that make you more mad?
>
> "A: Yes.
>
> "Q: And he did this in the living room; correct?
>
> "A: Yes.
>
> "Q: Was your wife there?
>
> "A: Yes.
>
> "Q: And your friends were there; correct?
>
> "A: Yes.
>
> "Q: So Jose Aviles had insulted you in front of all of these people; true?
>
> "A: Yes.
>
> "Q: And that made you mad; correct?
>
> "A: Yes."

### 3. *Solorio's Testimony Regarding His Interpretation of the Hostile Remarks Directed at Him*

The prosecutor also probed Solorio's earlier testimony regarding how he (Solorio) had interpreted the hostile remarks that had been directed at him at the party:

> "Q: So you thought that they invited you to that party for a four-year-old girl so that they could beat you, rob you, and harm your wife as well?
>
> "A: Yes, just when I heard the threats.

"Q: This is the same party with the pinata we are talking about?

"A: Yes.

"Q: And the cake; right?

"A: Yes.

"Q: For the little girl; correct?

"A: Yes.

"Q: They were going to do all these horrible things to you at the little girl's party; correct?

"A: That's what I don't know."

## D. The Jury Instructions, Verdict, Sentence, and Appeal

After the defense rested its case, the trial court turned to the topic of jury instructions. With input from counsel, the trial court resolved upon instructions to be given for the offenses of first and second degree murder, plus voluntary manslaughter based on a theory of imperfect self-defense. The trial court noted: "we are only instructing on one form of manslaughter, obviously," and then it and counsel moved on to the topic of verdict forms without either counsel registering an objection. The following day, the court instructed the jury as to first degree murder, second degree murder, and manslaughter based on imperfect self-defense, but not as to manslaughter based on heat of passion.

The jury returned verdicts of second degree murder with regard to each of the two decedents. The trial court then sentenced Solorio, and Solorio timely appealed.

## II.

## DISCUSSION REGARDING SOLORIO'S CONVICTIONS

Solorio's principal contention on appeal is that his convictions for second degree murder should be reversed because the trial court erred by

13

failing to instruct the jury on the lesser included offense of manslaughter based on heat of passion.[6] As a consequence, he says, the jury "never had the opportunity to consider the legal theory that best fit the facts." "[W]e review independently the question [of] whether the trial court improperly failed to instruct on a lesser included offense." (*People v. Souza* (2012) 54 Cal.4th 90, 113 (*Souza*); accord *People v. Cole* (2004) 33 Cal.4th 1158, 1215, *People v. Waidla* (2000) 22 Cal.4th 690, 739.)

## A. The Lesser Included Offense of Voluntary Manslaughter Based on Heat of Passion

Homicide is the killing of one human being by another. (*People v. Beltran* (2013) 56 Cal.4th 935, 941 (*Beltran*).) Such a killing can be classified as first degree murder, second degree murder, or manslaughter. If committed with malice aforethought, it is murder. (*People v. Breverman* (1998) 19 Cal.4th 142, 153 (*Breverman*); see also *Beltran*, at p. 941.) If the malice aforethought is "formed willfully, deliberately, and with premeditation," then the killing is first degree murder. (*Beltran*, 56 Cal.4th at p. 942.) If the malice aforethought is formed without those additional elements, then the killing is second degree murder. (*Ibid*.) And, if malice aforethought is *absent,* then the killing is not murder and may instead be classified as voluntary manslaughter. (*Breverman,* at p. 153 [" 'A defendant who commits an intentional and unlawful killing but who lacks malice is guilty of . . . voluntary manslaughter.' "].)

---

[6] In addition to contending that the trial court erred by not instructing the jury on the lesser included offense of manslaughter based on heat of passion, Solorio also contends that this instructional error harmed Solorio. Inasmuch as we find no instructional error (see *post*), however, we need not address the contention that Solorio suffered prejudice or harm.

In most circumstances, a defendant who intentionally and unlawfully kills another person acts with malice. (*Breverman, supra,* 19 Cal.4th at p. 153.) However, "in [certain] limited, explicitly defined circumstances," such a person acts *without* malice. (*Ibid*.) These include "when the defendant acts in a 'sudden quarrel or heat of passion' [citation] or when the defendant kills in 'unreasonable self-defense'—the unreasonable but good faith belief in having to act in self-defense." (*Id.* at pp. 153–154; see also *Beltran, supra,* 56 Cal.4th at p. 942 ["Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter."].) Thus, the law recognizes that, even though it is true that "*some* measure of thought is required to form either an intent to kill or a conscious disregard for human life,"[7] nonetheless "a person who acts *without reflection* in response to adequate provocation"—i.e., a person who acts in the heat of passion—"does not act with malice." (*Beltran,* 56 Cal.4th at p. 942, italics added.)

"Because heat of passion and unreasonable self-defense reduces an intentional, unlawful killing from murder to voluntary manslaughter by *negating the element of malice* that *otherwise inheres* in such a homicide [citation], voluntary manslaughter of [either of] these two forms is considered a lesser necessarily included offense of intentional murder." (*Breverman, supra,* 19 Cal.4th at p. 154.)

---

7    Malice can be express or implied. It is express when a person intends to kill. It " 'is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses.' " (*Beltran, supra,* 56 Cal.4th at pp. 941–942.)

**B.**     **The Duty of a Trial Court to Sua Sponte Instruct the Jury on Heat of Passion Voluntary Manslaughter Whenever the Offense Finds Substantial Support in the Evidence**

Whenever a lesser included offense (such as voluntary manslaughter based on heat of passion or imperfect self-defense) finds substantial support in the evidence presented to a jury, the trial court is obligated to sua sponte instruct the jury regarding that offense. (*Breverman, supra,* 19 Cal.4th at pp. 148–149, 160–163.) This obligation "exists even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given." (*People v. Barton* (1995) 12 Cal.4th 186, 195 (*Barton*); see also *Breverman.,* at pp. 154, 162.) Simply stated:

> "In the interests of justice, this rule demands that when the evidence suggests the defendant may not be guilty of the charged offense, but only of some lesser included offense, the jury must be allowed to 'consider the *full range* of possible verdicts—not limited by the strategy, ignorance, or mistakes of the parties,' so as to '*ensure* that the verdict is no harsher or more lenient than the evidence merits.' [Citations.] The inference is inescapable that, regardless of the tactics or objections of the parties, or the *relative* strength of the evidence on alternate offenses or theories, the rule requires sua sponte instruction on *any and all* lesser included offenses, or theories thereof, which are *supported* by the evidence. In a murder case, this means that both heat of passion and unreasonable self-defense, as forms of voluntary manslaughter, must be presented to the jury if both have substantial evidentiary support."

(*Breverman,* at p. 160.)

But the converse is also true. That is, the trial court is *not* obligated to instruct the jury on heat of passion voluntary manslaughter if heat of passion does *not* have substantial evidentiary support. (*Breverman, supra,* 19 Cal.4th at p. 160; *Souza, supra,* 54 Cal.4th at p. 140.) As our Supreme Court has explained, "the existence of '*any* evidence, no matter how weak' will not

16

justify instructions on a lesser included offense." (*Breverman,* at p. 162.) Rather, the evidence must be of a quantum or quality that the court has described, variously, as "evidence that a reasonable jury could find persuasive" (*Barton, supra,* 12 Cal.4th at p. 201, fn. 8; see also *Breverman,* at p. 162), "evidence . . . 'substantial enough to merit consideration' by the jury" (*Breverman,* at p. 162), and " ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]" ' " that the lesser offense, but not the greater, was committed." (*Ibid.*)

## C.    The Heat of Passion Standard

Before we can make a determination as to whether heat of passion has substantial evidentiary support in the record before us on this appeal, we first must satisfy ourselves as to the meaning of the phrase "heat of passion" when used as the basis for a conviction of manslaughter in lieu of murder. As an initial matter, we note it has oft been said that the "heat of passion requirement for manslaughter has both an objective and a subjective component." (*People v. Steele* (2002) 27 Cal.4th 1230, 1252 (*Steele*); accord *People v. Moye* (2009) 47 Cal.4th 537, 549 ("*Moye*") and *People v. Wickersham* (1982) 32 Cal.3d 307, 326–327.) Objectively, " 'this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances.' "[8] (*Steele,* at p. 1252, quoting *People v. Logan* (1917) 175 Cal. 45, 49 (*Logan*).)

---

[8]    As will be seen *post*, whereas the Supreme Court spoke in terms of the "ordinarily reasonable person" in its opinion in *Steele* (see *Steele, supra,* 27 Cal.4th at p. 1252), it used other formulations to refer to the same concept in other opinions. (See, e.g., *Beltran, supra,* 56 Cal.4th at p. 957 ["ordinary person of average disposition"]; *id.* at p. 939 ["ordinary men of average disposition"]; *id.* at p. 949 ["ordinary person"]; *Breverman, supra,* 19 Cal.4th at p. 163 [" ' "person of average disposition" ' "].)

17

Subjectively, the "defendant must actually, subjectively, kill under the heat of passion." (*Steele,* at p. 1252; see also *Wickersham,* at p. 327.)

In *Beltran*, our Supreme Court undertook to "clarify what kind of provocation will suffice to constitute heat of passion and reduce a murder to manslaughter." (*Beltran, supra,* 56 Cal.4th at p. 938.) The Court put front and center, in the opening and closing paragraphs of its opinion, a passage from one of its earlier opinions—*People v. Logan*—and commented on that passage as follows:

> "Nearly one hundred years ago, this court explained that, when examining heat of passion in the context of manslaughter, the fundamental 'inquiry is whether or not the defendant's reason was, at the time of his act, so disturbed or obscured by some passion . . . to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' (*People v. Logan* (1917) 175 Cal. 45, 49.) The proper standard focuses upon whether the person of average disposition would be induced to react from passion and not from judgment."

(*Beltran,* at pp. 938–39; see also *id.* at p. 957.)

In its opinion in *Beltran* the Court illuminated, from a variety of different angles, the meaning of its statements in the above-quoted passage (1) that the focus should be on "whether the person of average disposition would be induced to react from passion and *not from judgment*" (*Beltran, supra,* 56 Cal.4th at p. 939, italics added) and (2) that, for murder to be reduced to manslaughter based on heat of passion, the defendant's reason is required to have been " 'disturbed or obscured . . . to such an extent as would render ordinary men of average disposition liable to act . . . from . . . passion *rather than from judgment.*' " (*Ibid.*, italics added.) For example, the court said: (3) that, "[t]o be adequate" to the task of justifying a conviction of manslaughter in lieu of murder, "the provocation must be one that would

18

cause an emotion so intense that an ordinary person would simply *react, without reflection*" (*Beltran*, at p. 949, italics added); (4) that "the . . . passion [the provocation elicits] must be so strong that the defendant's reaction *bypassed* his thought process to such an extent that *judgment could not and did not intervene*" (*ibid.*, italics added); (5) that a "provocation is sufficient [to reduce murder to manslaughter] not because it affects the quality of one's thought processes, but because it *eclipses reflection*" (*id.* at p. 950, italics added); (6) that the provocation must be one that prompts a person to "simply react[] from emotion due to the provocation, *without deliberation or judgment*" (*ibid.*, italics added); (7) that the passion the provocation elicits ceases to justify a conviction for manslaughter in lieu of murder when the passage of time has permitted " 'passion to subside and reason to *return*' " (*id.* at p. 951, italics added); and (8) that that passion ceases to have that effect when the passage of time has allowed "for one's passions to 'cool off' and for 'judgment to be *restored*.' "  (*Ibid.*, italics added.)

Through each of these articulations, and through the force of all of them together, the court made manifest that, for a provocation to suffice to reduce murder to heat of passion manslaughter, it must be one that would induce an ordinary man of average disposition (objective component), and that did induce the defendant on trial (subjective component), to act in a manner that was bereft of reason.  In addition, lest there be any question on

this point, the court also forcefully refuted an implication[9] that the two requirements articulated in *Logan*—that the provocation be " 'such . . . as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection' " *and* " 'such . . . as would render ordinary men of average disposition liable to act . . . from this passion rather than from judgment' " (*Beltran, supra,* 56 Cal.4th at p. 939, quoting *Logan, supra,* 175 Cal. at p. 49)—could be considered in the disjunctive. (See *Beltran*, at pp. 949–950.) As can be seen, the court drove home the point that, for a heat of passion to reduce murder to manslaughter, the provocation that ignites it not only must impair a person's reason, it must *supplant* it. Moreover, it must do so not only in the defendant, but also in the "ordinary person of average disposition," aka the "ordinarily reasonable man."

**D.     Application of the Heat of Passion Standard to the Evidence in this Case**

The principles discussed above establish that a trial court is obligated to instruct the jury on heat of passion manslaughter as a lesser included offense if, and only if, the jury has been presented with substantial evidence that a defendant on trial for murder was provoked in a way that would have caused an ordinary person of average disposition, and that did cause the defendant, to react from anger or fear or panic or some other passion or

---

9      This implication arose when the Attorney General argued "that ' "acting rashly" means nothing more than acting hastily or imprudently, without consideration' and '[t]here are countless experiences in everyday life which would cause an ordinary person to act "rashly." ' " (*Beltran, supra,* 56 Cal.4th at pp. 949-950.) The court however disagreed, saying, "The argument misconstrues the standard." (*Id.* at p. 950.) "[P]rovocation is sufficient not because it affects the quality of one's thought processes but because it eclipses reflection. A person in this state simply reacts from emotion due to the provocation, without deliberation or judgment." (*Ibid.*)

emotion rather than comport himself in a manner informed by an exercise of judgment or reason.

In this case, the defense contends that this standard was satisfied by substantial evidence on the basis of which a reasonable juror could have found: (1) that German and Ventura provoked Solorio "by threatening [him] and his family," "by . . . disclos[ing] that [he] was perceived as engaging in homosexual conduct," "by advancing towards him when he returned to the apartment," or by "the combined effect" of the afore-described conduct; (2) that, at the time he killed German and Ventura, Solorio's "judgment was overwhelmed by intense emotion" attributable to such provocations; and (3) that "the average person would have reacted to [such] provocation[s] rashly from emotion instead of from judgment," as he argues he did.

In support of these contentions, the defense argues substantial evidence supports inferences: that serious threats and insults were directed at Solorio during the party; that it was German, not Jose, who uttered the threats and insults, and that German and Ventura's conduct "could reasonably have been interpreted by [Solorio] as their adoption of Jose's verbal threats and their signaling that they would help Jose carry[] out the threat to 'fuck [Solorio] up;' "[10] that such threats and insults made Solorio "angry," "mad," and "upset" to the point that (by the account of one witness, Rosario), when he returned to the apartment, "he had a crazed look on his

_____

[10] Solorio's arguments regarding to whom the making of the threats and insults should be attributed are directed at case law to the effect that the " ' 'provocation which incites the defendant to homicidal conduct in the heat of passion must be caused *by the victim* [citation], or be conduct reasonably believed by the defendant to have been engaged in *by the victim*." ' " (See *People v. Nelson* (2016) 1 Cal.5th 513, 540, italics added, quoting *Moye, supra,* 47 Cal.4th at pp. 549–550.)

face;" that the passage of time between Solorio's departure from the party and his return to the apartment might have been as little as 15 minutes or less; that, when Solorio returned to the apartment, he intended to talk, rather than shoot; that, before shooting, he warned German and Ventura not to approach him; and that the jury would have been at liberty to disbelieve whatever portions of Solorio's or other witnesses' testimony clashed with such evidence. (Cf. *Lopez, supra,* 14 Cal.5th at 591 and *Wader, supra,* 5 Cal.4th at 641, both discussed *ante* at fn. 3.)

But even if we were to agree with every one of these arguments and view the evidence in the light most favorable to the result Solorio is advocating,[11] we nevertheless would conclude that no heat of passion manslaughter instruction was warranted because the record in this case is without substantial evidence to support either, let alone both, of the two components required to reduce murder to manslaughter.

1. ***Application of the Subjective Component of the Heat of Passion Standard***

Insofar as the subjective component of the heat of passion standard is concerned, we note that, while the record does indeed include testimony that could support an inference that Solorio was insulted and threatened, that the insults and threats were attributable to German and conceivably to Ventura, and that the insults and threats engendered a powerful passion in Solorio, it

---

[11] The record reveals varying levels of support for Solorio's arguments. For example, whereas multiple witnesses testified that Solorio became angry, mad, or upset at the party, no witness testified "that [he] was perceived as engaging in homosexual conduct." In all events, we find it unnecessary to evaluate the evidentiary support on an argument-by-argument basis because we conclude that, even if *all* the arguments were to find substantial support in the evidentiary record, a heat of passion manslaughter instruction would not have been warranted.

22

includes *no* evidence to suggest that Solorio's actions were *ruled* by such passion or that his reason had taken flight. That is, it does not include evidence to the effect that Solorio "simply react[ed], without reflection" (*Beltran, supra,* 56 Cal.4th at p. 949), that his reaction "*bypassed* his thought process to such an extent that *judgment could not and did not intervene*" (*ibid.*), or, stated in yet another way, that he "simply reacted from emotion due to . . . provocation, *without deliberation or judgment.*" (*Id.* at p. 950.) Indeed, to the contrary, all of the evidence is to the effect that Solorio exercised judgment (albeit not always good judgment) every step of the way.

Far from revealing an absence of reason, the undisputed evidence reveals that, at the time Solorio left the party, he had the presence of mind to make reasoned decisions, including: his decision to not engage in a fight because he was outnumbered and his decision to drive his wife and daughters home so as to place physical distance between them and the men who he says he perceived as a threat to them. Similarly, Solorio's undisputed testimony reveals that, after he arrived home, he had the presence of mind to make additional reasoned decisions, including: his decision to return to the apartment in an effort to defuse the threat and his decision to arm himself for protection. In like fashion, the undisputed evidence reveals that, once he had returned to the apartment, he had the presence of mind to reflect on the optics of the confrontation he was about to initiate. So doing, he reasoned that, if the men realized he was armed, they might be less emboldened by their strength in numbers to resort to violence instead of acquiescing to his desire that they simply retract the threat. And it was on the basis of this reasoning that he made a judgment to present himself in a manner that unambiguously signaled he was armed. Likewise, Solorio's undisputed testimony reveals that, even as the men were coming at him, Solorio's mind

23

was "focused on speaking to them," while remaining vigilant to the fact "that they fought as a group" and the fact that they "could have . . . weapons." In all of these disparate ways, the undisputed evidence—including Solorio's own testimony about his state of mind—contradict the notion that he "simply react[ed] from emotion . . . without deliberation or judgment."[12] (See *Beltran, supra,* 56 Cal.4th at p. 950.) The evidence makes abundantly clear that reason and deliberation and judgment informed Solorio's actions at every turn.

**2.** ***Application of the Objective Component of the Heat of Passion Standard***

Turning to the objective component of the heat of passion standard, we reject the notion that any or all of the three stimuli that Solorio has cited as provocations can suffice to constitute a provocation of the sort that is sufficient to merit a manslaughter instruction. The first such stimulus—the statement that Solorio had been invited to the party so that one or more of the men there could " 'fuck [him] up, . . . take [his] money, and get even . . . through her' " is a stimulus that, if taken at face value, *could* cause fear; but—as Solorio's *own* behavior demonstrated, it is not a stimulus that would provoke a passion so strong as to prompt an ordinary person to simply react, "without reflection," "without deliberation," "without judgment," in a manner that would "bypass[] his thought process to such an extent that judgment could not . . . intervene." (See *Beltran, supra,* 56 Cal.4th at pp. 949–950.)

---

12    We note Rosario testified that, when Solorio returned to the apartment, "he had a crazed look on his face." In our view, this testimony supports an inference that Solorio acted in a heat of passion; however, it is a single isolated snippet that, in our view, does not rise to the level of substantial evidence. (See discussion of substantial evidence standard (citing *Breverman, supra,* 19 Cal.4th at p. 162 and *Barton, supra,* 12 Cal.4th at p. 201, fn. 8) *ante.*

So too is it the case with the second of the three stimuli—homophobic epithets—that Solorio cites as a provocation. While it is true, as Solorio points out, that homosexuality is a trait that throughout much of history has stirred opprobrium, that taunts associated with it can engender feelings of humiliation in some individuals, and that the effects of such taunts on such individuals might have been more powerful in 1987 than they are today, it also is true that "call[ing] [someone] a 'faggot' . . . would not drive any ordinary person to act rashly or without due deliberation and reflection." (See *People v. Najera* (2006) 138 Cal.App.4th 212, 226 [use of "faggot" epithet does not suffice to establish provocation within the meaning of the objective component of the heat of passion standard].)[13]

As for the third of the three stimuli on which Solorio relies—the conduct of German and Ventura in "advancing towards him when he returned to the apartment"—it, too, does not suffice to constitute provocation of a sort that would warrant a manslaughter instruction. Although Solorio and the Attorney General disagree as to whether the gun was in Solorio's hand—versus at his hip—when the men began advancing towards him, it remains a fact that every eyewitness who testified (including Solorio) agreed

_____

[13]    As stated in *Logan* and reaffirmed in *Beltran*, " 'no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man.' " (*Beltran, supra,* 56 Cal.4th at p. 950, citing *Logan*; see also *Steele, supra,* 27 Cal.4th at pp. 1252–1253.)

that Solorio arrived conspicuously armed.[14]  Under such circumstances—with Solorio having transformed himself from a party guest into a conspicuously armed and unwelcome intruder in German's home—the men's behavior in advancing towards him when he returned to the apartment cannot reasonably be classified as a legally sufficient provocation under the heat of passion standard.[15]  (Cf. *People v. Blacksher* (2011) 52 Cal.4th 769,

[14]     Notably, in the present case, the menace did not come to Solorio; rather, Solorio came to the menace.  To illustrate:  In *Breverman,* the evidence on the basis of which the Supreme Court concluded a heat of passion manslaughter instruction should have been given was "that a sizeable group of young men, armed with dangerous weapons and harboring a specific hostile intent, trespassed upon domestic property occupied by [the] defendant," that they "challenge[d] . . . [the defendant] to fight, [and] use[d] [their] weapons to batter and smash [his] vehicle parked in the driveway of his residence, within a short distance from the front door," "that the number and behavior of the intruders . . . caused immediate fear and panic" (*Breverman, supra*, 19 Cal.4th at p. 163), and that it might have been from this fear and panic that the defendant fired his weapon.  In the *present* case, by contrast, the evidence on the basis of which Solorio contends a heat of passion manslaughter instruction should have been given is that, after having had the presence of mind to retreat from a group of men posing a danger, the defendant reversed course by voluntarily returning to the danger and amplifying it by visibly and deliberately introducing a gun.

[15]     Solorio argues the "right to 'bear' arms in public for self-defense" entitles an individual to bring a weapon into the home of another individual without that other individual's permission.!(ARB 62-63)!  In support of this argument, he cites *New York State Rifle & Pistol Assn., Inc. v. Bruen* (2022) 597 U.S. 1 for the proposition that "[t]he Second Amendment's plain text . . . presumptively guarantees . . . a right to 'bear' arms in public for self-defense." (*Id.* at p. 34.)  However, we know of no authority to the effect that the right to bear arms in public for self-defense entitles an individual to bring a weapon into the home of another.  (Cf. *Antonyuk v. Hochul* (N.D.N.Y. 2022) 639 F.Supp.3d 232, 343 ("thus far the Second Amendment has been found to protect the right to keep and bear arms for self-defense only in one's *own* home or in *public*.")

833 [" ' "[n]o case has ever suggested . . . that such predictable conduct by a resisting victim would constitute the kind of provocation sufficient to reduce a murder charge to voluntary manslaughter;" ' " quoting *People v. Jackson* (1980) 28 Cal.3d 264, 306 and *People v. Kanawyer* (2003) 113 Cal.App.4th 1233, 1247; cf. *Souza, supra,* 54 Cal.4th at 117 ["predictable and reasonable conduct by a victim resisting felonious assault . . . [is] not provocation sufficient to merit a manslaughter instruction"]; *People v. Enraca* (2012) 53 Cal.4th 735, 760; *People v. Rich* (1988) 45 Cal.3d 1036, 1112.)

While not perfectly analogous, we see substantial similarities between Solorio's arguments in this case and the arguments that the defense presented on appeal in *Moye*. In that case, the defendant testified to having experienced a succession of three provocations. The first provocation was a fight involving the defendant and several other men. (*Moye, supra*, 47 Cal.4th at p. 542). The second provocation occurred when one of the men against whom the defendant had fought kicked the defendant's car the following day as the defendant was trying to engage with him "in order to talk, try to resolve things, and avoid a continuing conflict." (*Id.* at p. 545.)

The third provocation occurred when the defendant followed the man, so that he could ascertain the man's location and report it to police, but instead found himself confronted by the man, who now was armed with a baseball bat. (*Moye, supra*, 47 Cal.4th at p. 545.) After having been struck with the bat several times, the defendant succeeded in wresting the bat from his adversary and then, "right when I got it from him, . . . he tried to rush me, like to attack me," "so I hit him with the bat." (*Id.* at p. 546.) Then, "[e]very time he came at me I hit him again with the bat." (*Ibid.*) "I was worried about getting hit again, because he kept coming at me. So I kept hitting him until he fell." (*Ibid.*)

27

As in the present case, the trial court instructed the jury on self-defense manslaughter but refused to instruct on heat of passion manslaughter (*Moye, supra*, 47 Cal.4th at p. 547) and the jury convicted the defendant of second degree murder. (*Id.* at p. 548.) The court of appeal reversed the trial court (*ibid.*), and the Supreme Court reversed the Court of Appeal:

> "We conclude the evidentiary record supports the trial court's determination that there was insubstantial evidence to warrant instruction on a sudden quarrel/heat of passion theory of voluntary manslaughter. In particular, substantial evidence was lacking that defendant killed while subjectively under the actual influence of 'a strong passion aroused by a "provocation" sufficient to cause an " 'ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' [Citations.]" ' Defendant's own uncontested testimony established he did not act rashly, or without due deliberation and reflection, or from strong passion rather than from judgment, when he claimed to have used the bat defensively to allegedly fend off an attack from the homicide victim."

*Moye, supra*, 47 Cal.4th at p. 541. In the present case, as in *Moye*, an escalating series of provocations culminated in a burst of violence that resulted in death. Passions played a role, but so did reason. And, viewed objectively, none of the provocations, alone or in combination, constituted provocation of a sort that would mandate a heat of passion manslaughter instruction. Hence we conclude the trial court did not err in excluding heat of passion from its instructions to the jury on the lesser included offense of manslaughter.

## III.

## DISCUSSION REGARDING SOLORIO'S SENTENCE

In addition to challenging his conviction, Solorio also contends the trial court erred in not awarding him presentence conduct credits, and in imposing a parole revocation restitution fine, because the Penal Code sections on which those aspects of his sentence were premised did not take effect until after he committed his offenses.  Citing the sections of the Penal Code that were in effect at the time of the offenses, he argues, *first,* that the trial court's award of 1,193 days of presentence custody credits should be increased, by 198 days, to account for presentence conduct credits—thus resulting in a total of 1,391 days of presentence custody credits—and, *second,* that the parole revocation restitution fine that the trial court imposed should be stricken.  The Attorney General agrees with each of these contentions.  He states that he does not object to this court either awarding the credits or remanding the matter for the trial court to recalculate and award appropriate credits, and that the fine should be stricken.

## IV.
## DISPOSITION

The matter is remanded to the trial court with instructions (a) that the custody credits be recalculated; (b) that the abstract of judgment be amended to show the recalculated number of credits and to strike the parole revocation restitution fine; and (c) that a copy of the amended abstract of judgment then be forwarded to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

KELETY, J.

WE CONCUR:


BUCHANAN, Acting P. J.


CASTILLO, J.